IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Q MANAGEMENT, a Utah corporation, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> SNAKE RIVER EQUIPMENT ) <br> COMPANY, an Idaho corporation, ) <br> WATKINS ENTERPRISES, an Idaho ) <br> Limited Liability Company, and ) <br> DANE H. WATKINS, an individual, ) <br> ) <br> ) <br> Defendants. ) <br> ) | Case No. CV 05-322-E-MHW <br><br> **MEMORANDUM DECISION** <br> **AND ORDER** |

Currently pending before the Court are: Defendants' Motion to Join Jason E. Farr as an Additional Defendant to Counterclaim (Docket No. 60); Defendants' Motion for Summary Judgment (Docket No. 69); Plaintiff's Motion for Summary Judgment on Third Cause of Action for Breach of Option Agreement (Docket No. 71); Plaintiff's Rule 56(f) Motion for Further Discovery (Docket No. 82); Plaintiff's Motion to Strike Affidavits of Dane H. Watkins and Gordon S. Thatcher filed September 4, 2007 (Docket No. 84); and Defendants' Motion to Strike Affidavits (Docket No. 94).

**Memorandum Decision and Order - Page 1**

# I.
# Background

Plaintiff Q Management Group, Inc. ("Q Management")[1] formerly operated two Quiznos Sub restaurants located in Idaho Falls, Idaho.  One was located at 620 West Broadway, Idaho Falls, Idaho ("the Eagle Rock Quiznos") and another at 2001 South 25 East, Idaho Falls, Idaho ("the Ammon Town Quiznos").  Q Managment leased office space for the Eagle Rock Quiznos ("the Eagle Rock Lease") from Watkins Company.[2]  In 2003 and 2004, disputes arose between Q Management and Watkins Company regarding an exclusivity provision contained in the Eagle Rock Lease.  In 2004, Q Management and Defendants negotiated an agreement to resolve existing claims between them under the Eagle Rock Lease through Defendants' purchase of the Eagle Rock Quiznos and assumption of the Eagle Rock Lease.  The negotiations ended with Q Management and Snake River executing an Asset Purchase Agreement dated July 18, 2005.

As a part of the same transaction, Q Management also granted Snake River an option to purchase the Ammon Town Quiznos by 5:00 p.m. on September 1, 2005 (the "Option Agreement").  Again, a dispute arose over whether Defendants had ever exercised this option or had exercised the option and then repudiated.  On August 11, 2005, Q Management filed a lawsuit in this Court against Defendants alleging a breach of the Asset Purchase Agreement.  On November 30, 2005, it amended its complaint to include a claim for breach of the Option Agreement.

---

[1] Jason E. Farr is the President of Q Management.

[2] Watkins Company is owned and operated by Defendant Dane Watkins and is an affiliate of Defendant Snake River Equipment Co.  Dane Watkins is also a principal of Snake River Equipment Co ("Snake River").  These parties will collectively be referred to as "Defendants."

On May 31, 2006, the parties participated in a settlement conference with Judge Larry M. Boyle which resulted in a verbal agreement of settlement that was read into the record (the "Settlement Agreement"). *See Second Amended Complaint*, Exhibit 5. The terms of the Settlement Agreement, as provided in the transcript, included that:

> 1) the Quiznos franchise restaurant at Ammon Town Center would be sold through a licensed commercial realtor;
> 2) the parties would cooperate in the designation, selection and hiring of such a realtor within thirty days of the settlement conference, or July 1, 2006;
> 3) the realtor would list the Ammon Town Quiznos location for a period of six months commencing once the agent was retained;
> 4) the property would be sold and the restaurant as a going concern would be sold to the highest buyer that made an offer within that six-month period;
> 5) in the event that an offer came in which would not await the expiration of the listing, the parties would have to agree whether to accept or reject that offer within that time period and if they did not agree, it would be rejected;
> 6) any offer that came in would have to be from a qualified offeree who was acceptable to both parties and Quiznos Incorporated, the franchisor, or the sale would be impossible;
> 7) Defendants would have a right of first refusal on any offer otherwise acceptable to Q Management Group and Quiznos Incorporated on identical terms offered by the offeror within the six-month period;
> 8) at the end of the six-month period, the named Defendants would pay to Q Management a sum equal to the difference between any sale proceeds received from any sale of the Ammon Town location and the sum of $150,000 plus $7,500 in attorney fees;
> 9) if a sale was not consummated within that six-month period, Q Management would then transfer all of its right, title and interest in the Ammon Town location to the Defendants, or their designee, in exchange for the payment of $150,000 plus $7,500 in attorney's fees;
> 10) the parties were to bear their respective costs and fees, other than what was specified in the agreement.

*Second Amended Complaint*, Ex. 5. Both Mr. Farr, on behalf of Q Management, and Mr. Watkins, on behalf of Snake River and Watkins Company, agreed to be bound to the Settlement Agreement and stated that they understood it was a settlement of all claims arising out of the

**Memorandum Decision and Order - Page 3**

pending litigation. *Id*. Judge Boyle directed the parties to prepare written settlement documents to file with the Court.

On June 6, 2006, Mr. Farr claims he first received notification from Quiznos Sub Incorporated ("Quiznos") of a possible termination of the Ammon Town store's franchise. In a letter dated April 13, 2006, Quiznos, the franchisor, informed Mr. Farr and Q Management that the franchise was to be terminated in ten days for repeated defaults under the Franchise Agreement. The termination notice stated that the franchise could be extended if the First Addendum, attached to the notice, was signed. Counsel for Q Management brought this letter to the attention of Defendants' counsel on June 12, 2006. At that time, Q Management's counsel indicated that he was in discussion with Quiznos concerning finalization of the settlement and an extension of the franchise to permit disposition of the Ammon Town location as per the Settlement Agreement. He also stated that Quiznos was reluctant to extend the franchise for a full six months. *See Answer and Counterclaim to Amended Complaint*, Ex. I. Defendants' counsel responded shortly thereafter, while still working towards a written embodiment of the Settlement Agreement, that the news of the franchise termination was "alarming," of "utmost concern" and that the very foundation of the Settlement Agreement could be undermined if matters were not handled correctly. *Id*., Ex. J.[3]

On June 29, 2006, the parties agreed to have realtor Randy Waters list the Ammon Town location for sale. *Affidavit of Jason E. Farr*, Ex. 8. On July 6, 2006, Quiznos again threatened to terminate the franchise if Mr. Farr did not sign the First Addendum. Mr. Farr chose not to sign

---

[3] Proposed settlement documents had been drafted by Plaintiff's counsel and submitted to Defendants' counsel on June 5, 2006 and the parties did engage in some discussion of the terms but the papers were ultimately never signed.

**Memorandum Decision and Order - Page 4**

the First Addendum because of the required release any of and all claims Q Management might have against Quiznos.  However, Quiznos did not terminate the franchise as threatened.  During this time period, Q Management's counsel continued to attempt a negotiation for an extension of the Franchise Agreement.  *Affidavit of Vincent C. Rampton*, ¶¶ 15-18.

On August 2, 2006, Defendants' counsel inquired into Quiznos' counsel about the current status of the Ammon Town Franchise Agreement and received no response.  After a status conference held on August 3, 2006 with this Court, the parties engaged in a second settlement conference with Judge Boyle on August 17, 2006.  At that conference, Defendants' counsel allegedly made statements that his clients believed Q Management knew of the potential franchise termination of the Ammon Town Quiznos prior to the first settlement conference, making the Settlement Agreement unenforceable against Defendants.  *See Rampton Aff.*, ¶ 6.

On August 18, 2006, Quiznos terminated the Franchise Agreement for the Ammon Town store.  Q Management stopped operating the restaurant on September 10, 2006.  Even after this termination, Q Management continued to market the store for sale.  *Affidavit of Jason E. Farr*, ¶¶ 21, 25.  Q Management allegedly participated in ongoing discussions with Quiznos regarding its ability to sell the Ammon Town store to Defendants or another qualified buyer.  *Farr Aff.*, ¶ 26.  Plaintiff alleges that it received information from Quiznos' representatives that it refused to extend the franchise termination date, in part, because there was no prospective third party purchaser.  *Farr Aff.*, ¶ 22.[4]

Q Management states it received an offer from Thad Kendell to purchase the Ammon Town store on October 5, 2006, for $135,000.  Mr. Kendell later terminated his offer after he had

---

[4] This statement is subject to Defendants' motion to strike (Docket No. 94).

**Memorandum Decision and Order - Page 5**

allegedly had a discussion with Dane Watkins' son and determined it "wasn't the deal for him." *Affidavit of Randy Waters*, ¶¶ 4-5.[5]  Q Management also alleges that in early 2007, it received an offer from Kurt and Vicki Nielsen to purchase the Ammon Town store for $90,000 and that Quiznos worked with the Nielsens to execute a new franchise agreement.  However, a dispute with the landlord caused the potential sale to fall through.  *Farr Aff.*, ¶¶ 28, 29, 30.[6]

On June 12, 2007, a status conference was held in this case.  The Court ordered that a Second Amended Complaint be filed and any dispositive motions regarding the Settlement Agreement be filed by August 30, 2007.  On August 30, 2007, Defendants filed a motion for summary judgment on the grounds that Plaintiff had substantially breached the Settlement Agreement by failing to operate the Ammon Town Quiznos as a going concern until the closing of a sale and by failing to assure that a sale would be approved by Quiznos, thereby excusing the Defendants from buying the Ammon Town Quiznos.  On the same day, Plaintiff filed a motion for summary judgment on its third cause of action for breach of the Option Agreement.  Plaintiff maintains that since the Defendants contend the Settlement Agreement was fraudulently induced and unenforceable, it is entitled to return to its pre-Settlement Agreement position and should be granted summary judgment on the Option Agreement.

/

/

/

/

---

[5] These statements are also subject to Defendants' motion to strike (Docket No. 94).

[6] These statements are also subject to Defendants' motion to strike (Docket No. 94).

**Memorandum Decision and Order - Page 6**

## II.
## Discussion

**A.     Summary Judgment Standard**

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. Rule 56, which provides in pertinent part, that judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007).

A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). It is not enough for the [non-moving] party to "rest on mere allegations or denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.,* at 250. "When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.,* at 254. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party. To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law. *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591 (9th. Cir. 1981).

The Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 500 (9th Cir. 1992). The Ninth Circuit has found that in order to resist a motion for summary judgment,

> the non-moving party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund,* 882 F.2d 371, 374 (9th Cir. 1989).

## B.   Settlement Agreement[7]

Defendants contend that a settlement "read into the record" is binding upon the parties and supersedes and extinguishes all pre-existing claims the parties intended to settle. *See Doi v. Halekulani Corp.*, 276 F.3d 1131 (9th Cir. 2002); *Goodman v. Lothrop*, 143 Idaho 622, 151 P.3d

---

[7] Throughout the briefing, Plaintiff argues that Defendants intend to rescind the settlement agreement based on allegations of fraud. Plaintiff's argument is based on initial statements made by Defendants' counsel when they first learned of the potential franchise termination as well as statements of fraud in these pleadings. The Court disagrees with Plaintiff's argument. Defendants never made an election to rescind the Settlement Agreement. Also, they are allowed to plead alternative defenses. *See* Fed. R. Civ. P. 8(d). *See also Moon v. Brewer*, 89 Idaho 59, 402 P.2d 973 (1965) (a defrauded party *may* make an election to rescind the contract and sue for restitution or affirm the contract and sue for damages, but cannot be compelled to do so). Defendants have repeatedly stated they seek to enforce, not rescind, the contract and the Court finds no valid argument why they are not entitled to do so.

**Memorandum Decision and Order - Page 8**

818, 821 (2007). Defendants assert that as a part of the Settlement Agreement, Q Management was to operate the Ammon Town Quiznos as a going concern in compliance with the Franchise Agreement until closing of the sale. They contend that there were several events that either were substantial breaches of the Settlement Agreement or defeated the fundamental purpose of the Settlement Agreement, thereby fully excusing Defendants from performing under the agreement. These events include: the notice of franchise termination received by Q Management on June 6, 2006; Q Management's failure to assure Defendants that a sale of the Ammon Town Quiznos to a qualified buyer would be approved by Quiznos by December 31, 2006; and Q Management's failure to continue to operate the Ammon Town Store as a going concern until closing of the sale.

      Defendants' argument relies on its contention that the operation of the Ammon Town Quiznos as a going concern until December 31, 2006, was a fundamental aspect of the Settlement Agreement, as was the approval of Quiznos to the sale. When the franchise was terminated in August 2006 and the business subsequently closed on or before September 10, 2006, Defendants contend the Settlement Agreement was breached as Q Management could not make the agreed transfer. At that point, Defendants no longer had any duty to perform, namely purchase the Ammon Town location, under the Settlement Agreement. Defendants maintain that a shut-down business with a terminated franchise agreement cannot, as a matter of law, be a "going concern." Black's Law Dictionary 7th ed. defines a "going concern" as: "A commercial enterprise actively engaging in business with the expectation of indefinite continuance."

      Plaintiff attempts to defeat summary judgment by arguing that there are genuine issues of material facts as to whether Q Management could have performed its obligations under the

**Memorandum Decision and Order - Page 9**

Settlement Agreement and deliver the Ammon Town Quiznos as a going concern on or before December 31, 2006, despite termination of the franchise agreement and subsequent closure of the store. Plaintiff contends its only obligation was to deliver the Ammon Town Quiznos as a going concern upon sale of the store and that there was no obligation to operate the store as a going concern for that entire six-month period, up until December 31, 2006. Plaintiff points out that Defendants worked towards a written settlement agreement and securing a real estate agent despite their initial concerns about the threatened termination of the Franchise Agreement.

Additionally, Plaintiff submits that there is a genuine issue of material fact as to whether Defendants themselves caused or contributed to Q Management's inability to sell the store and/or the termination of the Franchise Agreement. This is based on real estate agent Randy Waters's statement that after Mr. Kendell had made an offer for the Ammon Town Quiznos, he decided he wanted to terminate the offer after he had "discussed it with Dane Watkins' son, who was running another Quiznos in the area, and determined it wasn't the deal for him." *Waters Aff.*, ¶ 5.[8] Under Idaho law, Plaintiff argues, one party to a contract cannot, through its own conduct, prevent the performance of the other party and then rely on the other party's non-performance to recover damages or avoid their own obligations under the contract.

Lastly, Plaintiff contends that Defendants had a duty to mitigate upon learning of the potential franchise termination. Plaintiff submits that Defendants delayed in selecting and hiring a licensed real estate agent for the Ammon Town Quiznos and did nothing to assist in selling the store to a qualified buyer. Plaintiff essentially argues that upon learning that the Franchise Agreement may be terminated, Defendants should have accelerated their purchase of the store.

---

[8] This is subject to Defendants' Motion to Strike.

**Memorandum Decision and Order - Page 10**

Instead, according to Plaintiff, Defendants sat back and made no efforts to help sell the property, and possibly even hindered a potential sale.

Defendants argue that their efforts in the selection of a realtor were timely, they did not interfere with the efforts of Plaintiffs' counsel to resolve the problems with the Franchise Agreement and they had no duty to take care of the problems with the Ammon Town store. Defendants contend that they had no duty, or right, to buy the store until Q Management exhausted its right to sell it. Lastly, they maintain that Q Management's entire argument that they interfered with the sale of the business is based on a hearsay statement of realtor Randy Waters. The alleged event also took place after October 5, 2006, which was after the franchise had been terminated and the business shut down.

A breach of contract is non-performance of any contractual duty of immediate performance. *Independence Lead Mines Co. v. Hecla Mining Co.*, 143 Idaho 22, 137 P.3d 409, 415 (2006). If a breach of the contract is material, the other party is excused from performing. *J.P. Stravens Planning Assocs. v. City of Wallace*, 129 Idaho 542, 545, 928 P.2d 46, 49 (Ct. App. 1996). A substantial or material breach of contract is one which touches the fundamental purpose of the contract and defeats the objects of the parties in entering into the contract. *Id*.

The Settlement Agreement required that the Ammon Town Quiznos be actively marketed, and sold, as a "going concern" during a six-month period that was to end on December 31, 2006. If a third party purchaser was not located during that time period, Defendants were to purchase the restaurant for $157,500, or pay the difference if it was sold to a third party for less than $157,500. In August 2006, Quiznos terminated the Franchise Agreement

**Memorandum Decision and Order - Page 11**

for the Ammon Town store due to multiple defaults of the agreement on the part of Plaintiff.  In September 2006, Plaintiff shut down and ceased operating the Ammon Town Quiznos.

Once the franchise terminated and the business subsequently shut down, it ceased being a "going concern" and could no longer be marketed as such.  A going concern is defined as "a commercial enterprise actively engaging in business with the expectation of indefinite continuance."  Black's Law Dictionary, 7th ed.  There was not an active, on-going business to be sold as of, approximately, September 10, 2006.  The Settlement Agreement was premised on the purchase of a business.  Without a business to market and sell, the fundamental purpose of the Settlement Agreement had been defeated.  The Court disagrees with Plaintiff's argument that the Settlement Agreement required only that the business be a going concern *on* December 31, 2006.  Such an interpretation is inconsistent with the terms and intent of the agreement.  The Ammon Town Quiznos could not be marketed as a "going concern" if it was closed down.

Under the terms of the Settlement Agreement, as read into the record on May 31, 2006, Defendants were under no obligation to purchase the Ammon Town Quiznos unless it remained unsold as of December 31, 2006, when the six-month period expired.  On December 31, 2006, Defendants had no duty to purchase the Quiznos because the Settlement Agreement had been substantially breached, thereby excusing Defendants from performance.  There was no obligation on Defendants to purchase the Ammon Town Quiznos until that six-month period expired.  The Court disagrees with Plaintiff's attempt to place the blame for the restaurant shutting down on Defendants because they did not "accelerate" their purchase of it once they learned of the possible franchise termination.  There was no obligation on Defendants to purchase the

**Memorandum Decision and Order - Page 12**

restaurant until December 31, 2006. Since the Settlement Agreement was breached prior to that, Defendants were excused from purchasing a defunct business.

## C.     Plaintiff's Claim for Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff brings a claim of breach of the covenant of good faith and fair dealing as it relates to the Settlement Agreement based on the allegations that "Defendants used the threatened termination of the franchise agreement as an excuse for its failure and refusal to perform its obligations under the Settlement Agreement, when the real reason for its repudiation of its obligations...was, upon information and belief, the lack of available cash or financing to perform."

Defendants argue that this claim is foreclosed by the express terms of the Settlement Agreement. This covenant may be implied if it arises only regarding terms agreed to by the parties, and requires that the parties, in good faith, perform the obligations to the agreement. *Independence Lead Mines Co. v. Hecla Mining Co.*, 143 Idaho 22, 137 P.3d 409, 413 (2006). The covenant of good faith and fair dealing cannot override an express provision in a contract and no covenant will be implied which "is contrary to the terms of the contract negotiated and executed by the parties." *Id*. In that case, the Idaho Supreme Court found that the plaintiff's interpretation of what constituted good faith and fair dealing, that the defendant must cease mining when metal prices dropped below that which was necessary to guarantee plaintiff a profit, contradicted the express term of the contract providing that the defendant had the exclusive right to manage, control and operate the mine and that all decisions made by the defendant shall be final. *Id*. at 414.

**Memorandum Decision and Order - Page 13**

Here, Plaintiff's interpretation of what constituted good faith and fair dealing was that Defendants should have purchased the Ammon Town Quiznos once it became aware of the potential franchise termination. As stated above, Defendants were under no obligation to purchase the Ammon Town Quiznos unless it was still on the market as of December 31, 2006. The Settlement Agreement was breached when the business ceased being a going concern in September 2006, thereby excusing Defendants' performance under the agreement. Plaintiff's argument that Defendants breached the covenant of good faith and fair dealing by not purchasing the restaurant when it became aware of the potential franchise termination conflicts with the terms of the Settlement Agreement. The Settlement Agreement required that Defendants purchase the Ammon Town Quiznos only if remained unsold as of December 31, 2006 and also that the business be sold as a "going concern." A provision requiring Defendants to purchase the Quiznos when it learned of the potential franchise termination cannot be implied in this contract.

### D.     Plaintiff's Third, Fourth and Fifth Claims

Plaintiff's Third, Fourth and Fifth Claims for Relief all concern the Option Agreement, including claims for breach of the Option Agreement, breach of the covenant of good faith and fair dealing and equitable estoppel. Plaintiff brings these alternative claims insofar as the Settlement Agreement is unenforceable.

Defendants submit that these claims are superseded by the Settlement Agreement which was a "settlement of all claims arising out of this litigation." *Defendants' Answer to Second Amended Complaint*, Ex. D. *See Goodman v. Lothrop*, 143 Idaho 622, 151 P.3d 818 (2007).

Plaintiff resubmits its argument noted above, that Defendants have asserted the Settlement Agreement is unenforceable and therefore the parties are put in their pre-contract position and their original claims are revived.

The existence of a valid agreement[9] of compromise and settlement is a complete defense to an action based on the original claim. *Id.* at 821. The agreement supersedes and extinguishes all pre-existing claims the parties intended to settle. *Id.*

The Settlement Agreement entered into the record on May 31, 2006, superseded and extinguished all the claims the parties had at the time, which included claims based on the Option Agreement. The existence of the Settlement Agreement is a complete defense to Plaintiff's third, fourth and fifth claims. Summary judgment on these claims will be entered in favor of Defendants.

## III.
## Plaintiff's Motion for Summary Judgment on Option Agreement

Plaintiff filed this motion on the belief that Defendants were arguing that the Settlement Agreement is unenforceable. If Defendants were correct in this argument, Plaintiff sought summary judgment entered in its favor on one of its pre-Settlement Agreement claims, breach of the Option Agreement. As stated previously, the Settlement Agreement supersedes and extinguishes all claims based on the Option Agreement. Plaintiff's motion for summary judgment is denied.

---

[9] The Ninth Circuit has recognized a valid settlement agreement can exist where the material terms were put on the record in open court. *See Doi v. Halekulani Corp.*, 276 F.3d 1131, 1137 (9th Cir. 2002). In this case, the parties went into open court, announced they had reached a settlement, read the terms into the record and the representatives for both parties affirmed that they intended to be bound by the agreement and that they understood it was a settlement of all the claims.

**Memorandum Decision and Order - Page 15**

## IV.
### Defendants' Motion to Join Jason E. Farr as Additional Defendant to Counterclaim

Defendants filed this motion to join Jason Farr as a counterdefendant based on Plaintiff's first Amended Complaint which brought suit on the Option Agreement.  The Option Agreement was part of an earlier settlement agreement which stated that Q Management and Mr. Farr shall be deemed as one.  The motion is also based on Defendants' counterclaim brought against Q Management and Mr. Farr from their earlier Answer to Amended Complaint and Counterclaim.  Defendants' answer to Plaintiff's second Amended Complaint does not contain a counterclaim.

In response, Plaintiff points out that in its Second Amended Complaint, it no longer seeks to enforce that earlier settlement agreement and therefore Mr. Farr's status as a party to that earlier settlement is irrelevant.  It also asserts that Defendants have set forth no evidence that Q Management lacks the resources to satisfy a judgment or that they should be able to pierce the corporate veil and hold Mr. Farr personally liable.

Fed. R. Civ. P. 13(h) provides that "Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim."  Rule 19(a)(1) provides that a person shall be joined as a party in the action if "(A) in that person's absence, the court cannot accord complete relief among existing parties, or (B) the person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may" impair or impede the person's ability to protect that interest or leave any of the persons already parties subject to a substantial risk in incurring double or inconsistent obligations.

As no counterclaim exists against Mr. Farr and the Court has decided that summary judgment be entered in favor of Defendants, the Court finds that joinder of Jason Farr as a

**Memorandum Decision and Order - Page 16**

counterdefendant is not necessary.  There is nothing that indicates complete relief cannot be afforded without joining him as a party.  Accordingly, this motion is denied.

## V.
### Plaintiff's Rule 56(f) Motion for Further Discovery

In response to Defendants' motion for summary judgment, Plaintiff filed a motion for further discovery pursuant to Rule 56(f).  In this motion, Plaintiff seeks further discovery in order to adequately respond to, and defeat, Defendants' motion.  Specifically, Plaintiff seeks information that will help it determine: (1) the reasons for and circumstances under which Quiznos terminated the Franchise Agreement and required the Ammon Town store to be closed; (2) whether the Franchise Agreement could have been reinstated, or whether a new franchise could have been issued to Defendants (or some other qualified purchaser) and at what cost; and (3) what impact, if any, a temporary closure of the Ammon Town store would have had on Q Management's ability to deliver the Ammon Town store to Defendants or some other qualified buyer as a going concern, and on the ability of Defendants or some other qualified purchaser to operate the Ammon Town store as a going concern thereafter.  The discovery Plaintiff seeks to obtain includes: (1) the receipt and review of documents from Quiznos relating to the Ammon Town store; (2) the Rule 30(b)(1) deposition of Brian Kessler, Quiznos' district manager over the geographical area that included the Ammon Town store; and (3) the rule 30(b)(6) deposition of Quiznos.  Plaintiff would also like to obtain information as to Defendants' alleged interference with a contract for sale of the Ammon Town store with Thad Kendell.

The Court has already determined that Defendants' motion for summary judgment should be granted.  In accordance with that determination, this motion will be denied.  The Court finds

that the information Plaintiff seeks would have no effect on its finding that the Settlement Agreement was breached when the business ceased being a "going concern."

## VI.
### Plaintiff's Motion to Strike Affidavits of Dane H. Watkins and Gordon S. Thatcher

Plaintiff moves to strike the affidavits of Dane H. Watkins and Gordon S. Thatcher that were filed in conjunction with Defendants' motion for summary judgment. Plaintiff points out that neither of these affidavits are cited in Defendants' statement of facts and therefore are irrelevant and should be stricken. In the alternative, Plaintiff argues that certain portions of Mr. Watkins's affidavit be stricken as they are not based on personal knowledge, are irrelevant or otherwise constitute inadmissible evidence. In addition, Plaintiff submits that based on Defendants' pleadings, it appears Mr. Thatcher intends to serve as a fact witness for Defendants in this case and as such, he is precluded from also serving as trial counsel *See* I.R.P.C. 3.7.

Defendants first contend that it does not matter whether their statement of facts contains references to the affidavits at issue, instead, what is important is that the information before the Court, including the affidavits, form the basis on which the Court must make a determination on the motion for summary judgment. They also individually address Plaintiff's evidentiary objections. Lastly, Defendants contend that Mr. Thatcher is not being introduced as a fact witness but rather to provide background information regarding the Settlement Agreement and events that took place afterwards.

The Court will not strike the affidavits of Dane H. Watkins and Gordon S. Thatcher in their entirety. To the extent these motions contain hearsay and improper legal conclusions, the Court did not consider those portions of the affidavits in deciding the pending motions. The motion will be granted in part and denied in part.

**Memorandum Decision and Order - Page 18**

## VII.
## Defendants' Motion to Strike Affidavits

Defendants move to strike the affidavits, in whole or in part, of Jason E. Farr, Vincent F. Rampton, and Randy Waters. Defendants make several grounds for striking these affidavits, including that they: are irrelevant, are not based on personal knowledge, contain inadmissible hearsay, contain speculation, contain improper legal conclusions and lack foundation.

Similar to above, to the extent these affidavits contain hearsay and improper legal conclusions, the Court did not consider those statements in making its determination on the motions for summary judgment. The motion will be granted in part and denied in part.

## **ORDER**

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)   Defendants' Motion to Join Jason E. Farr as Additional Defendant to Counterclaim (Docket No. 60), be **DENIED**;

2)   Defendants' Motion for Summary Judgment (Docket No. 69), be **GRANTED**;

3)   Plaintiff's Motion for Summary Judgment on Third Cause of Action for Breach of Option Agreement (Docket No. 71), be **DENIED**;

4)   Plaintiff's Rule 56(f) Motion for Further Discovery (Docket No. 82), be **DENIED**;

5)   Plaintiff's Motion to Strike Affidavits of Dane H. Watkins and Gordon S. Thatcher filed September 4, 2007, (Docket No. 84), be **GRANTED IN PART and DENIED IN PART**; and

6)   Defendants' Motion to Strike Affidavits (Docket No. 94), be **GRANTED IN**

**PART and DENIED IN PART**.



DATED: January 24, 2008

_____
Honorable Mikel H. Williams
Chief United States Magistrate Judge

**Memorandum Decision and Order - Page 20**